# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| KYLE FELDMAN, on behalf of himself and all others similarly situated,<br><br>          Plaintiff,<br><br>vs.<br><br>STAR TRIBUNE MEDIA COMPANY LLC,<br><br>          Defendant. | File No. 0:22-cv-01731-ECT-TNL<br><br><br>**DEFENDANT STAR TRIBUNE MEDIA COMPANY LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS** |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 4

    A.    Congress Passes The Video Privacy Protection Act To Prevent What Happened To Judge Robert Bork In 1988. ...................................... 4

    B.    A Program Called Facebook Pixel Sends Data to Facebook When Facebook Users Watch Videos on the Star Tribune's Website. ................ 7

    C.    Plaintiff's Alleges That Use Of Facebook Pixel Violates The VPPA. ................................................................................................. 10

STANDARD OF REVIEW ................................................................................... 11

ARGUMENT ...................................................................................................... 12

I.    Plaintiff Lacks Article III Standing. ....................................................... 12

    A.    Plaintiff Does Not Allege That He Suffered An Injury In Fact Analogous To A Traditionally Recognized Harm At Common Law. ............................................................................................ 13

    B.    Plaintiff Does Not Allege An Injury Fairly Traceable To An Action Taken By The Star Tribune. ............................................... 20

II.    Plaintiff Fails to State a Claim Under The VPPA. .................................. 23

    A.    Plaintiff Fails to Plausibly Allege That The Star Tribune Disclosed "Personally Identifiable Information" Connecting Plaintiff To The Videos He Watched. ......................................... 24

    B.    Plaintiff Fails To Plausibly Allege That The Star Tribune "Knowingly" Disclosed Personally Identifiable Information Connecting Plaintiff To The Videos He Watched. ......................... 28

    C.    Plaintiff Consented To The Disclosure Of His Personally Identifiable Information To Third Parties. ............................... 29

CONCLUSION ................................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Agred Found. v. U.S. Army Corp of Eng'rs*,
   3 F.4th 1069 (8th Cir. 2021) ................................................................. 20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................. 11

*Barclift v. Keystone Credit Servs., LLC*,
   585 F. Supp. 3d 748 (E.D. Pa. 2022) ................................................. 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................. 11

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
   2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017) ...................................... 8

*Braitberg v. Charter Comm's, Inc.*,
   836 F.3d 925 (8th Cir. 2016) .............................................................. 11

*Branson Label, Inc. v. City of Branson*,
   793 F.3d 910 (8th Cir. 2015) ..................................................12, 20, 21

*Clapper v. Amnesty Int'l, USA*,
   568 U.S. 398 (2013) ............................................................................. 20

*Eichenberger v. ESPN, Inc.*,
   876 F.3d 979 (9th Cir. 2017) ........................................................... 6, 19

*Garland v. Orlans, PC*,
   999 F.3d 432 (6th Cir. 2021) .............................................................. 20

*Grupo Petrotemex, S.A. de C.V. v. Polymetrix AG*,
   2019 WL 1230003 (D. Minn. Mar. 15, 2019) ................................ 11, 21

*Hatchett v. Fin. Bus. & Consumer Sols., Inc.*,
   2022 WL 377002 (M.D.N.C. Feb. 8, 2022) ..................................... 16, 17

*In re Hulu Privacy Litig.*,
   86 F. Supp. 3d 1090 (N.D. Cal. 2015) ..........................................*passim*

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
   48 F.4th 1236 (11th Cir. 2022) ...................................................17, 18, 19

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................. 20

*Mollett v. Netflix, Inc.*,
  2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) .................................................... 6

*Nabozny v. Optio Sols., LLC*,
  583 F. Supp. 3d 1209 (W.D. Wis. Feb. 1, 2022) .................................. 17, 18

*In re Nickelodeon Consumer Privacy Litig.*,
  827 F.3d 262 (3d Cir. 2016) ....................................................................*passim*

*Ojogwu v. Rodenburg Law Firm*,
  26 F.4th 457 (8th Cir. 2022) ...................................................... 12, 13, 14, 15

*Robinson v. Disney Online*,
  152 F. Supp. 3d 176 (S.D.N.Y. 2015).............................................................. 25

*Shields v. Professional Bureau of Collections of Maryland, Inc.*,
  2021 WL 4806383 (D. Kan. Oct. 14, 2021) ........................................ 17, 18

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .................................................................................... 12, 19

*Sputz v. Alltran Fin., LP*,
  2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021) ......................................... 16, 18

*St. Louis Heart Ctr., Inc. v. Nomax, Inc.*,
  899 F.3d 500 (8th Cir. 2018) ................................................................... 22, 23

*Sterk v. Redbox Automated Retail, LLC*,
  770 F.3d 618 (7th Cir. 2014) ......................................................................... 19

*In re SuperValu, Inc.*,
  870 F.3d 763 (8th Cir. 2017) ......................................................................... 20

*Swarthout v. Mut. Serv. Life Ins. Co.*,
  632 N.W.2d 741 (Minn. App. 2001)............................................................. 15

*Thole v. U.S. Bank N.A.*,
  140 S. Ct. 1615 (2020) ..................................................................................... 11

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .............................................................................*passim*

*Wilson v. Triller, Inc.*,
  --- F. Supp. 3d ---, 2022 WL 1138073 (S.D.N.Y. Apr. 18, 2022)............................... 6

*Yath v. Fairview Clinics, N.P.*,
  767 N.W.2d 34 (Minn. App. 2009)............................................................... 15

*Zean v. Fairview Health Servs.*,
  858 F.3d 520 (8th Cir. 2017) .............................................................24, 30, 32

**Statutes, Rules & Regulations**

15 U.S.C. § 1692 ................................................................................................. 17

18 U.S.C. § 2710 ........................................................................................... *passim*

Fed. R. Civ. P. 12(b)(1) ................................................................................... 2, 11

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 11

**Other Authorities**

Andrea Peterson, *How Washington's Last Remaining Video Rental Store*
    *Changed the Course of Privacy Law*, WASHINGTON POST (Apr. 28, 2014) ..................... 4

Marc Chase McAllister, *Modernizing the Video Privacy Protection Act*, 25
    Geo. Mason L. Rev. 102 (2017) ..................................................................... 5

Restatement (Second) of Torts § 652.................................................14, 15, 16

## INTRODUCTION

This is a class-action lawsuit brought against the Minnesota newspaper publisher Star Tribune Media Company LLC (the "Star Tribune"). Plaintiff Kyle Feldman ("Plaintiff") accuses the Star Tribune of violating an obscure federal privacy statute called the Video Privacy Protection Act (the "VPPA"). The VPPA prohibits "video tape service providers" from "knowingly" disclosing "personally identifiable information" that "identifies a [customer] as having requested or obtained specific video materials or services from [the] video tape service provider." 18 U.S.C. § 2710(a)(3)-(4),(b)(1). If an aggrieved customer proves that an intentional disclosure of her personally identifiable information and video rental history occurred, she is entitled to $2,500 in statutory damages, per disclosure. *Id.* § 2710(c)(2)(A).

Although Congress intended this law to be "quite narrow" to address a very specific incident in American history, *see In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 284-85 (3d Cir. 2016) (discussing the impetus for passage of the VPPA— publication of Judge Robert Bork's video rental history in 1988), plaintiffs' attorneys have been using the $2,500-per-violation statutory damages figure to bring nationwide putative class actions seeking tens or hundreds of millions of dollars against a wide swath of companies that have any online video content—now including the Star Tribune. How is a newspaper like the Star Tribune violating a statute about *video* privacy, one might fairly ask? According to the allegations in Plaintiff's complaint— which must be taken as true—it goes something like this:

1

Like many websites, the Star Tribune uses a small piece of code on its website called Facebook Pixel. Facebook Pixel discloses two pieces of data to Facebook every time a Facebook user watches a video on www.startribune.com, but only while also logged into their Facebook account. The two pieces of data are: (1) a "cookie" that includes the subscriber's Facebook ID number within its long alphanumeric string, and (2) a startribune.com URL containing the title of the video the subscriber watched. Because someone at Facebook could hypothetically combine these two pieces of data to determine the startribune.com videos watched by Plaintiff and other subscribers, Plaintiff surmises that use of the Facebook Pixel tool violates the VPPA's prohibition on disclosing "personally identifiable information" about one's video rental history to third parties. Notably, however, Plaintiff does not allege that any human on earth *actually saw* his www.startribune.com video watching history—whether at Facebook or otherwise. Other than vague allegations of "loss of privacy," Plaintiff claims no physical, emotional, financial, or other injury. If this doesn't sound like something that belongs in a courtroom, that's because it doesn't, for many reasons.

***First***, Plaintiff fails to satisfy two distinct elements of Article III standing. He has not pled (1) a ***concrete*** injury-in-fact under the standard set forth in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). Nor can he establish (2) that his injury is ***fairly traceable*** to any action of the Star Tribune. Indeed, after the Court considers undisputed facts, which it can do under Rule 12(b)(1), it will become clear that Plaintiff, not the Star Tribune, is the cause of sending any information to Facebook.

2

*Second*, Plaintiff fails to plausibly allege that the Star Tribune made the kind of disclosure of "personally identifiable information" prohibited by the VPPA—*i.e.*, a disclosure *connecting* information identifying a specific person to a specific set of videos watched, like the Judge Bork disclosure that prompted the VPPA's passage. Transmitting digital cookies from one web browser to another—that could *hypothetically* be combined to reveal a user's recently watched videos—is a far cry from a video store clerk handing a reporter a list of Judge Bork's recently rented videos.

*Third*, Plaintiff fails to plausibly allege that the Star Tribune *knowingly* disclosed Plaintiff's "personally identifiable information" in violation of the VPPA. The statute requires intent, and nothing in the Complaint plausibly alleges the Star Tribune intentionally disclosed Plaintiff's history of watching videos on www.startribune.com (like the video store clerk did with Judge Bork).

*Finally*, the Star Tribune's privacy policy, which is incorporated by reference into the Complaint, indisputably shows that, even if the Star Tribune disclosed information under the VPPA, Plaintiff consented to that disclosure, and consent is a complete defense to any VPPA claim. *See* 18 U.S.C. § 2710(b)(2)(B).

The Court should dismiss the Complaint in an opinion addressing each of the aforementioned grounds, so that attorneys considering similar lawsuits think twice before stretching the VPPA beyond its plain text and intended purpose, and before subjecting any other company with online video content and Facebook Pixel to threats of liability and tens or hundreds of millions of dollars in statutory damages.

## BACKGROUND

The following allegations are taken from the Complaint and documents referenced therein, or are background facts of which the Court can take judicial notice. Each citation to "¶__" is to the corresponding paragraph in the Complaint.

### A.    Congress Passes The Video Privacy Protection Act To Prevent What Happened To Judge Robert Bork In 1988.

In an infamous 1988 incident, the *Washington City Paper* published an exposé disclosing Judge Robert Bork's then-recent video rental history. "The paper had obtained (without Judge Bork's knowledge or consent) a list of the 146 films that the Bork family had rented from a Washington, D.C.-area video store [over a two-year period]." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 278 (3d Cir. 2016). Given Judge Bork's stature, the story immediately went viral. As a result, the entire world knew every film the Bork family had watched from 1986 to 1988.[1]

Out of this incident arose the peculiar statute underlying Plaintiff's Complaint: the Video Privacy Protection Act (VPPA). This law bars "video tape service providers"—entities "engaged in the business" of the "rental, sale, or delivery of prerecorded cassette tapes or similar audio visual materials"—from "knowingly" disclosing "personally identifiable information" that "identifies a [customer] as having

---

[1] For additional background, see Andrea Peterson, *How Washington's Last Remaining Video Rental Store Changed the Course of Privacy Law*, WASH. POST (Apr. 28, 2014), *available at* https://www.washingtonpost.com/news/the-switch/wp/2014/04/28/how-washingtons-last-remaining-video-rental-store-changed-the-course-of-privacy-law/ (describing the exposé as a "huge story" at the time).

requested or obtained specific video materials or services from [the] video tape service provider." 18 U.S.C. § 2710(a)(3)-(4),(b)(1); *see also id.* § 2710(b)(2)(B) (providing a statutory safe harbor when the customer consents to the disclosure). If an aggrieved customer proves such an intentional disclosure occurred, she is entitled to $2,500 in statutory damages per disclosure, plus attorneys' fees. *Id.* § 2710(c)(2).

As the Act's text suggests, this is a narrow statute, focused on "preserv[ing] personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." S. Rep. No. 100-599, at 1 (1988), *available at* 1988 WL 243503. It is meant to prevent what happened to Judge Bork from happening to anyone else. *See, e.g., id.* at 5, 8 (calling Judge Bork the "impetus" for the Act's passage); *In re Nickelodeon*, 827 F.3d at 284-85 (reviewing the legislative history and describing the law as "quite narrow"). Despite the VPPA's narrow, brick-and-mortar origin, however, in recent years the plaintiffs' class-action bar has reimagined the law as focusing on *websites'* use of consumers' *video-streaming* data—and litigation has exploded as a result. *See generally* Marc Chase McAllister, *Modernizing the Video Privacy Protection Act*, 25 Geo. Mason L. Rev. 102 (2017).

This new class of VPPA cases is generally premised on websites' use of "cookies," bits of digital data that track user activity across internet locations. *See In re Nickelodeon*, 827 F.3d at 268 (providing background on cookie technology). This matters for VPPA purposes because plaintiffs have taken to arguing that when a user watches a video on one company's website, and then a cookie containing data about

the video is shared with *another* company's website, then an unlawful "disclosure" of "personally identifiable information" regarding "video materials or services" has occurred—even if no data ever is viewed by any human being, ever becomes public, or otherwise resembles the circumstances surrounding Judge Bork's disclosure.

The initial targets of these newfangled VPPA cases were large video-streaming services like Netflix and Hulu—understandable targets, given their roots in the brick-and-mortar video store. *See, e.g., In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090 (N.D. Cal. 2015); *Mollett v. Netflix, Inc.*, 2012 WL 3731542 (N.D. Cal. Aug. 17, 2012).

Other members of the class-action bar, however, have expanded their horizons, filing VPPA suits against *any* company that so much as streams videos and allows "third-party cookies" to be used on its website. The targets have ranged from sports outlets, see *Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017), to social media applications, see *Wilson v. Triller, Inc.*, --- F. Supp. 3d ---, 2022 WL 1138073 (S.D.N.Y. Apr. 18, 2022).

This case falls squarely in the latter tradition, except with a target that is even *more* distant from Judge Bork's brick-and-mortar video store: a newspaper, the Star Tribune, whose content is more written than anything else, and whose website has short videos summarizing the news stories its journalists cover.

**B.    A Program Called Facebook Pixel Sends Data to Facebook When Facebook Users Watch Videos on the Star Tribune's Website.**

With this context in mind, we turn to the two key players underlying Plaintiff's allegations here: the Star Tribune and Facebook.

The Star Tribune is a Minnesota-based newspaper publisher that owns and operates a website, www.startribune.com. (¶12.) Startribune.com "receives millions of visits per year." (*Id.*) On it, readers can find both "written articles" and "a wide array of video content." (¶13.)

Facebook is a large social-media company. For each Facebook user there exists a numerical "Facebook ID" that is "uniquely associated with [the user's] Facebook account." (¶18.) Standing alone, the ID does not reveal a user's name. However, if one appends a Facebook ID to the end of "Facebook.com," the resulting URL takes one to the user's Facebook page. (¶29.)

According to the Complaint, the Star Tribune uses on its website a "code analytics tool" called "Facebook Pixel." (¶21.) Facebook Pixel uses "cookies" to collect information about what Facebook users are doing on startribune.com, "such as the pages a visitor views and the content they view," and then sends that information to Facebook. (¶¶22, 25.) Facebook Pixel sends these cookies *only* when a Star Tribune user is simultaneously logged into their Facebook account. (¶¶44, 48.) *Accord In re Hulu*, 86 F. Supp. 3d at 1093-94.

Thus, the Complaint alleges, when a Facebook user is logged into Facebook, and then also watches a video on startribune.com, Facebook Pixel causes the following two pieces of data to be disclosed to Facebook: (1) the URL of the Star Tribune video the user has just watched, and (2) a cookie that includes the user's numerical Facebook ID among a long string of alphanumeric characters. (¶¶25-28.) With this information, Plaintiff alleges, "the [startribune.com] video material accessed by a specific [Facebook user] can be determined." (¶¶29-30.)

Notably, however, Plaintiff does not allege that this "simultaneous disclosure" **connects** specific Facebook IDs with specific startribune.com video URLs—or that anyone at Facebook makes this connection at any time. Nor does Plaintiff allege that any personally identifiable information—such as a person's name, or email address, or phone number—are disclosed to anyone.

Instead, Plaintiff's theory is that the Star Tribune's mere use of Facebook Pixel violates the VPPA because Facebook Pixel causes one piece of "personally identifiable information" (a subscriber's Facebook ID) to be disclosed to a third party (Facebook) at or around the same time another piece of information identifying "specific video materials or services" (a startribune.com URL), is disclosed to that same third party. *Cf.* 18 U.S.C. § 2710(a). *See, e.g., Bernardino v. Barnes & Noble Booksellers, Inc.*, 2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017) (similar allegations); *In re Hulu*, 86 F. Supp. 3d at 1093-94.

8

In support, the Complaint cites the following screenshot. But the Complaint does not explain where the screenshot came from, or how it corresponds to the disclosures at issue here.

(¶25 (markings added by Plaintiff).)

The Complaint is even vaguer when it comes to the Star Tribune's role in this allegedly improper disclosure. All the Complaint alleges is that the Star Tribune "knows" that video URLs and Facebook IDs are "simultaneously disclosed by Facebook Pixel," and that "such data in combination identifies subscribers and the videos they watched." (¶¶31-32.)

As will be explained below, however, any disclosures that occur as a result of the Star Tribune's use of Facebook Pixel are *entirely within a user's control*, and can easily be changed to prevent cookies from being shared with third parties like Facebook. *See infra* Argument § I.B.

9

### C.   Plaintiff's Alleges That Use of Facebook Pixel Violates The VPPA.

Plaintiff calls the Star Tribune's use of Facebook Pixel an "outrageous invasion of privacy [that] would be offensive to a reasonable person." (¶36.) When it comes to explaining how the Star Tribune's use of Facebook Pixel *actually injured* Plaintiff, however, the Complaint is light on details.

All the Complaint alleges is that "Plaintiff has regularly watched videos on [Star Tribune's] Website using the same device and/or browser in which he is logged into his Facebook account," and that, "[e]ach time Plaintiff watched a video on [Star Tribune's] Website," Plaintiff's Facebook ID and a URL link were "simultaneously disclosed . . . to Facebook via Facebook Pixel." (¶¶48-49.) The Complaint does *not* allege: (1) what Star Tribune videos Plaintiff watched that Facebook Pixel sent to Facebook; (2) whether any actual person at Facebook saw, or could see, his Pixel-generated data; or (3) how the disclosure of this data in any way harmed Plaintiff.

Nonetheless, on July 7, 2022, Plaintiff filed this lawsuit on behalf of himself and the "thousands of individuals" who subscribe to the Star Tribune and have a Facebook account—accusing the Star Tribune of knowingly disclosing "personally identifiable" subscriber viewing data to Facebook, in violation of the VPPA. (¶56.) The Complaint seeks both injunctive and monetary relief. Given the "100,000 subscribers" to the Star Tribune (¶14), and the VPPA's $2,500-per-occurrence statutory-damages figure, Plaintiff's complaint exposes the Star Tribune to potential liability in the tens or hundreds of millions of dollars.

## STANDARD OF REVIEW

Two standards of review are invoked by this motion.

First, the Star Tribune challenges the factual basis for Plaintiff's allegations of standing, which go to the Court's jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "The party invoking federal jurisdiction bears the burden of establishing" Article III standing. *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 929 (8th Cir. 2016). To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must "plausibly and clearly" allege facts demonstrating each element of Article III standing. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1621 (2020). If a defendant challenges the factual basis for the Court's jurisdiction, the Court may take evidence and hold a hearing to make factual findings. *See, e.g.*, *Grupo Petrotemex, S.A. de C.V. v. Polymetrix AG*, 2019 WL 1230003, at *3 (D. Minn. Mar. 15, 2019).

The Star Tribune also challenges the legal sufficiency of Plaintiff's allegations. *See* Fed. R. Civ. P. 12(b)(6). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

## ARGUMENT

There are numerous grounds for dismissal, both as to standing, and on the merits of Plaintiff's claim. The Court should address standing first, because it goes to the Court's power to hear the case, and is the most straightforward basis for dismissal.

## I.     Plaintiff Lacks Article III Standing.

To establish Article III standing, a plaintiff must allege facts plausibly showing that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A defendant can challenge a plaintiff's standing either via a "facial attack"—in which case the plaintiff's allegations must be taken as true—or via a "factual attack"—in which case the court can consider outside evidence. *See Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015). The Star Tribune facially attacks Plaintiff's allegations of "concrete" injury, and factually attacks the "traceability" of any such injury to the Star Tribune.

More specifically: **(1)** Plaintiff fails to allege facts showing he suffered a concrete injury in fact; merely having a Facebook ID and unnamed URLs sent to Facebook doesn't suffice under the Supreme Court's recent decision in *TransUnion*. What's more, **(2)** uncontroverted outside evidence establishes that Plaintiff's injury, if any, is a self-inflicted wound not traceable to any action of the Star Tribune. The Court should thus dismiss Plaintiff's Complaint at the outset for lack of standing. *See, e.g.*, *Ojogwu v. Rodenburg Law Firm*, 26 F.4th 457, 461-64 (8th Cir. 2022).

### A.    Plaintiff Does Not Allege That He Suffered An Injury In Fact Analogous To A Traditionally Recognized Harm At Common Law.

The "first and foremost" element in the standing inquiry is "injury in fact." *Ojogwu*, 26 F.4th at 461. This element "requires the plaintiff to show that the harm [he allegedly suffered] is both concrete and particularized." *Id.* As the Supreme Court recently made clear, moreover, it is not enough for a plaintiff to merely allege that a defendant violated a statute. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Under Article III, an injury in law is not an injury in fact."). Rather, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* This requirement ensures that federal courts resolve only "real controvers[ies] with real impact on real persons." *Id.* at 2203; *see also id.* at 2205 ("Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions.").

To determine whether an alleged injury is sufficiently "concrete," or "real," for Article III purposes, *TransUnion* holds that a plaintiff must "identif[y] a close historical or common-law analogue for their asserted injury." *Id.* at 2204. This inquiry does not require plaintiffs to point to "an exact duplicate in American history and tradition" but the asserted analogue must at least bear "a *close relationship* to [a] harm[] traditionally recognized as providing a basis for lawsuits in American courts." *Id.* (emphasis added).

*TransUnion* offers the best recent example how to conduct this inquiry. There, the Supreme Court asked "whether the mere existence of a misleading [piece of information] in a consumer's internal credit file at TransUnion [allegedly in violation of the Fair Credit Reporting Act] constitute[d] a concrete injury." *Id.* at 2209. The plaintiff argued that it did, noting that the wrong was similar to the common-law tort of defamation. *Id.* at 2208. The Court rejected the argument. Because "publication" was "essential" to defamation at common law, and because the plaintiff did not allege that anything approximating "publication" had occurred there, the plaintiff failed to allege a concrete injury. *Id.* at 2209 & n.6; *see also, e.g.*, *Ojogwu*, 26 F.4th at 463 n.4 (similar analysis and outcome, where the alleged *de minimis* injury was nothing like "the well-established tort of intrusion upon seclusion").

Here, the allegations under "Cause of Action I" (¶¶64-72) contain *no* allegation of any injury. Plaintiff does not allege any physical, financial, reputational, or emotional injury. Nor does he allege *any* public disclosure of any information. If one looks more broadly, the only paragraph in the entire complaint even arguably alleging injury is the conclusory allegation that disclosure of his Facebook ID and unnamed URLs of videos he watched was "an outrageous invasion of privacy." (¶36.) The closest "historical analogues" to Plaintiff's injury are thus the common-law prohibitions against "disclosure of private information" and "intrusion upon seclusion." *TransUnion*, 141 S. Ct. at 2204; *see* Restatement (Second) of Torts § 652A (Oct. 2022 update) (reviewing privacy torts).

14

The next question is whether Plaintiff has plausibly alleged that his claimed privacy injury bears "a close relationship to" either of those two common-law harms. *Ojogwu*, 26 F.4th at 462. He has not, for he doesn't allege that ***anyone ever saw*** the allegedly improper disclosures.

At common law, a "disclosure of private information" occurs when "(1) a defendant [gives] 'publicity' to a matter concerning [the plaintiff's] private life, (2) the publicity of the private information [is] highly offensive to a reasonable person, and (3) the matter is not of legitimate concern to the public." *Yath v. Fairview Clinics, N.P.*, 767 N.W.2d 34, 42 (Minn. App. 2009). "Publicity" in this context means that the private matter is "communicat[ed] to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* An example of this tort would be if a newspaper "publishes, without B's consent, a picture of B nursing her child." Restatement (Second) of Torts § 652D, comment c, illustration 10.

Similarly, "intrusion upon seclusion" occurs when there is "(a) an intrusion, (b) that is highly offensive, and (c) into some matter in which a person has a legitimate expectation of privacy." *Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741, 744 (Minn. App. 2001). Examples include eavesdropping by wiretapping or other mechanical and electronic means, peering through windows, persistent telephoning, unauthorized prying into a bank account, and opening another's personal mail without consent. *See generally* Restatement (Second) of Torts § 652B.

15

The Facebook Pixel allegations here cannot plausibly be compared to "publication of private facts"—because Plaintiff does not allege that his Facebook ID and video URLs were seen by *anybody at Facebook*, much less "the public" at large. The most that can be inferred from the Complaint is that Plaintiff's video-viewing data was sent to a Facebook database. But the common law does not "protect[] against the exposure of private information to an inanimate object like a computer or printer." *Sputz v. Alltran Fin., LP*, 2021 WL 5772033, at *4 (S.D.N.Y. Dec. 5, 2021).

Nor is "intrusion upon seclusion" a proper analogue. Again, Plaintiff does not allege that anybody actually saw the cookie with his Facebook ID, so there simply was no "intrusion" on Plaintiff's privacy in the first place. And even if Plaintiff had alleged that somebody at Facebook had used the disclosed cookies to determine the titles of Plaintiff's recently viewed startribune.com videos (an extraordinarily unlikely possibility), Plaintiff does not explain what is "offensive" about that. (¶36.) Plaintiff does not allege what videos he watched. And there is nothing inherently sensitive, outrageous, or embarrassing about a third party learning that one watches videos on the website of a mainstream local news outlet. *Cf. Hatchett v. Fin. Bus. & Consumer Sols., Inc.*, 2022 WL 377002, at *5 (M.D.N.C. Feb. 8, 2022) (holding that disclosure to third party of non-sensitive financial information does not bear a close relationship to intrusion upon seclusion).

This case is therefore exactly like a growing class of "harmless disclosure" cases recently decided under the Fair Debt Collection Practices Act (FDCPA), in which one

circuit court and over a dozen district courts have rejected injury-in-fact allegations nearly identical to Plaintiff's here. *See, e.g.*, *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236 (11th Cir. 2022) (en banc); *Hatchett*, 2022 WL 377002; *Nabozny v. Optio Sols., LLC*, 583 F. Supp. 3d 1209 (W.D. Wis. 2022); *Shields v. Pro. Bureau of Collections of Maryland, Inc.*, 2021 WL 4806383 (D. Kan. Oct. 14, 2021); *see also Barclift v. Keystone Credit Servs., LLC*, 585 F. Supp. 3d 748, 757-58 (E.D. Pa. 2022) (collecting over a dozen similar cases).

The plaintiffs in these cases claimed that when a debt collector sent information about their debts to a "commercial mail vendor"—who then "inserted the information into a prewritten form letter" and mailed the debt information to the plaintiff—this disclosure violated the FDCPA's prohibition against disclosing debt information to third parties without the debtor's consent. *Hunstein*, 48 F.4th at 1240 (citing 15 U.S.C. § 1692c(b)). As support for this seemingly harmless disclosure constituting a concrete injury, plaintiffs cited the same "publication of private facts" and "intrusion upon seclusion" common-law analogues described above. Plaintiffs argued that the "disclosure" they suffered was "close enough" to those analogues for Article III purposes, even if nobody "read and understood the information," and even if no financial or emotional injury befell the plaintiff as a result of the disclosure. *Id.* at 1247. Following *TransUnion*, virtually every court to be confronted with plaintiffs' argument has rejected it, and has dismissed the FDCPA complaint for lack of standing. In so ruling, courts have made three points that are equally applicable here.

17

*First*, "publication of private facts" is an improper analogue when the alleged "disclosure" does not involve any *publicity*. "If an element from the common-law comparator tort is completely missing, it is hard to see how a statutory violation could cause a similar harm." *Hunstein*, 48 F.4th at 1245; *see also Sputz*, 2021 WL 5772033, at *5 ("Plaintiff has not alleged that a single person read or perceived his information, just that it was processed by a machine.").

*Second*, "intrusion upon seclusion" is an improper analogue because the "communication of purported non-payment of a relatively *de minimis* debt to a mailing vendor" is not "highly offensive to a reasonable person," especially if the disclosure is to a "vendor's computer," not to "others in society." *Sputz*, 2021 WL 5772033, at *5; *see also Shields*, 2021 WL 4806383, at *3 (disclosing the mere fact that "plaintiff had student-loan debt" would not be "highly offensive to a reasonable person").

*Third*, because Congress enacted the FDCPA to stop third-party disclosures that "rose to the level of collection abuse"—such as "disclosing a consumer's personal affairs to friends, neighbors, or an employer"—the kind of hyper-technical disclosure violation alleged did not "harm an interest [Congress] sought to protect." *Nabozny*, 583 F. Supp. 3d at 1214-15 (citing the FDCPA Senate Report).

All this reasoning applies with equal force here. Plaintiff does not allege any public disclosure. Plaintiff does not plausibly allege that the disclosures of unnamed URLs he visited to a Facebook system would be "highly offensive to a reasonable person." And Plaintiff's allegations are far from the situation like the Judge Bork

18

exposé that prompted the VPPA's passage. *See supra* Background § I. The same result should thus follow: dismissal for lack of a concrete injury under Article III.

To be sure, there are a couple stray cases holding that merely alleging improper disclosure under the VPPA is sufficient to show injury-in-fact. *See Eichenberger*, 876 F.3d at 983-84; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014). These decisions, however, predated *TransUnion* and cannot be squared with it. *TransUnion* rejected lenient understandings of "statutory privacy injuries" in favor of a much stricter historical-analogue analysis. *See* 141 S. Ct. at 2204, 2209 (emphasizing that plaintiffs must "identif[y] a *close* historical or common-law analogue for their asserted injury," and clarifying that the Court's prior decision in *Spokeo* was "not an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kind of suits should be heard in federal courts"). For this reason, the Eleventh Circuit, sitting *en banc*, recently held that *TransUnion* "put more meat on the bones" of the "common-law comparator" approach articulated in earlier Supreme Court decisions and rejected allegations of injury like Plaintiff's here. *See Hunstein*, 48 F.4th at 1244. The Court should not follow such pre-*TransUnion* outliers.

Because Plaintiff fails to sufficiently allege a concrete injury-in-fact, the Court must dismiss the Complaint without prejudice for lack of jurisdiction.[2]

---

[2] Plaintiff also does not allege facts suggesting that, because of the Facebook Pixel disclosures, he is at risk of suffering a *future* injury that is "certainly impending." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013). Thus, to the extent Plaintiff views his request for forward-looking injunctive relief as distinct from his request for

**B.** **Plaintiff Does Not Allege An Injury Fairly Traceable To An Action Taken By The Star Tribune.**

Even assuming Plaintiff pleaded a concrete injury-in-fact, the Court should still dismiss Plaintiff's Complaint because the factual record demonstrates that any alleged injury to Plaintiff is traceable not to the Star Tribune's actions, but to those of Plaintiff himself. Doing so requires going beyond the complaint, which the Court can do on jurisdictional issues like this. *See Branson Label*, 793 F.3d at 914-15.

Doctrinally, this question goes back to the second element of Article III standing analysis: Plaintiff must allege that his purported injury is "fairly traceable" to the Star Tribune's conduct, and not to another party's "independent action." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In other words, Plaintiff must "show a sufficiently direct causal connection between the challenged action and the identified harm" such that the connection between the two events is not "overly attenuated." *Agred Found. v. U.S. Army Corp of Eng'rs*, 3 F.4th 1069, 1073 (8th Cir. 2021). "Self-inflicted injuries fail under this prong [of the standing analysis] because they are, by definition, not traceable to anyone but the plaintiff." *Garland v. Orlans, PC*, 999 F.3d 432, 441 (6th Cir. 2021).

---

backward-looking monetary relief, Plaintiff fails to properly allege an injury-in-fact as to that claim. *See In re SuperValu, Inc.*, 870 F.3d 763, 769-72 (8th Cir. 2017).

As noted above, to show that a plaintiff's injury is self-inflicted, the defendant can raise a "factual attack" on the plaintiff's standing. *Branson Label*, 793 F.3d at 914. Under this standard, the Court need not take the plaintiff's allegations as true, and can consider "matters outside the pleadings, such as testimony and affidavits." *Id.* at 915. If necessary, the Court can hold a hearing and make factual findings. *See, e.g.*, *Grupo Petrotemex*, 2019 WL 1230003, at *3. It should do both in this case because the testimony and evidence will show unequivocally that the only person in control of whether any Facebook Pixel cookies are sent from his web browser Facebook is Plaintiff himself.

As the attached declaration from Jim Bernard, the Star Tribune's Senior Vice President – Digital shows, the Star Tribune's use of Facebook Pixel is *not* what caused Plaintiff's data to be disclosed to Facebook. To the contrary, information is sent to Facebook only because of any one of several actions (or non-actions) *taken by the user*.

*First*, a user can prevent cookies from being shared with Facebook by modifying browser settings. (Bernard Decl. ¶ 5.) Indeed, the Star Tribune makes clear in its Privacy Policy (Bernard Decl. Ex. A) that (like many websites) it uses third-party cookies, and specifically advises readers on how to modify browser settings to avoid those cookies if that is what users wish to do.

*Second*, a user can prevent cookies from being shared with Facebook by using a different browser to access startribune.com than the browser used to access Facebook. (Bernard Decl. ¶ 6.)

*Third*, a user can prevent cookies from being shared with Facebook by logging out of Facebook before watching any videos on startribune.com. (Bernard Decl. ¶ 7.) If a startribune.com reader follows *even one* of these three approaches, Facebook Pixel will not disseminate any data to Facebook.

On this point, the complaint lacks factual allegations sufficient to allow the Court to determine whether Plaintiff's alleged injury is "fairly traceable" to the Star Tribune on one hand, or Plaintiff's actions on the other, so the Court should hold a hearing. At that hearing, the Star Tribune will present evidence, laid out in the Bernard Declaration, demonstrating to the Court (1) how one logs into the startribune.com website; (2) how the Privacy Policy explains to users how to turn off "third-party cookies"; and (3) how, if one turns off third-party cookies (or takes any of the other actions described above), no information is ever disclosed, to Facebook or otherwise. A simple hearing will show, in other words, that Plaintiff's alleged privacy injury resulted from *his own* actions, not those of the Star Tribune, thus negating the "traceability" of his actions to the Star Tribune and any notion of Article III standing.

On this issue, *St. Louis Heart Center, Inc. v. Nomax, Inc.*, 899 F.3d 500 (8th Cir. 2018), is on point. There, a plaintiff alleged a highly technical violation of the Telephone Consumer Protection Act (TCPA)—that a medical company sent it fax advertisements that failed to contain an opt-out notice in a specific TCPA-required format. *Id.* at 502. The plaintiff alleged that this injured it because, among other

things, the allegedly improper faxes wasted its paper and toner, occupied its phone line, and invaded its privacy. *Id.* Discovery revealed, however, that the plaintiff "both invited and did not rebuke the challenged faxes." *Id.* at 504. Specifically, the plaintiff conceded during its deposition that it had "requested samples" of the defendant's product, and then did not opt out of receiving the faxes, despite the faxes providing it the opportunity to do so (albeit not in the technically correct form). *Id.* at 502, 504.

The Eighth Circuit affirmed the district court's decision to dismiss the case on traceability grounds. The plaintiff "cannot show that its alleged injury is traceable to [defendant's] alleged failure to provide a technically compliant opt-out notice" because "whether or not the faxes contained a proper opt-out notice, their transmission would have used [plaintiff's] paper and toner, occupied its phone lines, and invaded its privacy." *Id.* at 504. So too here. Because Plaintiff "both invited and did not rebuke" the Facebook Pixel disclosures, Plaintiff cannot blame the Facebook Pixel disclosures on the Star Tribune. It was a problem of his own making.

Accordingly, even if the Court finds Plaintiff adequately alleges an injury-in-fact, it should still dismiss the Complaint on traceability grounds.

## II.      Plaintiff Fails to State a Claim Under The VPPA.

Plaintiff's claim also fails on the merits, on two distinct elements.

As explained above, to state a claim under the VPPA, Plaintiff must plausibly allege that (1) the Star Tribune is a "video tape service provider," (2) the Star Tribune disclosed "personally identifiable information" that "identifies" Plaintiff "as having

requested or obtained specific video materials or services from" the Star Tribune, and (3) that the Star Tribune disclosed this information "knowingly." 18 U.S.C. § 2710(a)(3)-(4),(b)(1). Further, if documents incorporated by referenced into the Complaint show that the VPPA's consent "safe harbor" applies, then that, too, is proper grounds for dismissal. *Id.* § 2710(b)(2); *see e.g.*, *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526-28 (8th Cir. 2017).

Because Plaintiff fails to plausibly allege the second and third elements, and because documents incorporated into the Complaint show that Plaintiff consented to the disclosure of his startribune.com data to third parties via cookies, dismissal on the merits must likewise follow.

### A.   Plaintiff Fails To Plausibly Allege That The Star Tribune Disclosed "Personally Identifiable Information" Connecting Plaintiff To The Videos He Watched.

Assuming for present purposes that the Star Tribune qualifies as a "video tape service provider," Plaintiff must plausibly allege a disclosure of "personally identifiable information." The Complaint fails to do so.

The VPPA does not prohibit the disclosure of "personally identifiable information" in the abstract. Rather, it bars the disclosure of "personally identifiable information" that "identifies a [customer] as having requested or obtained specific video materials or services from [the] video tape service provider." 18 U.S.C. § 2710(a)(3),(b)(1). To violate the VPPA, then, "the information disclosed by a video tape service provider must, at the very least, identify a particular person," and

"**connect** this particular person with his or her viewing history." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015) (emphasis added).

This "connection" requirement is "indispensable" to the VPPA's purpose and structure. *In re Hulu*, 86 F. Supp. 3d at 1096. As explained above, the VPPA is "quite narrow"; it is simply meant to prevent privacy violations approximating what happened to Judge Bork, *i.e.*, "disclosures of information that would, with little or no extra effort, permit an ordinary recipient to identify a particular person's video-watching habits." *In re Nickelodeon*, 827 F.3d at 284. There is no evidence that, "when Congress passed the Act, it intended for the law to cover factual circumstances far removed from those that motivated its passage." *Id.* (extensively reviewing legislative history). Hence, a VPPA plaintiff must plausibly allege facts showing a disclosure at least "akin" to the Judge Bork disclosure—meaning a disclosure "connecting" a specific person "to his video [viewing] history." *In re Hulu*, 86 F. Supp. 3d at 1096. "Every step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim." *In re Nickelodeon*, 827 F.3d at 290.

Plaintiff's allegations come nowhere close to meeting this standard. He alleges only that (1) the Star Tribune's use of Facebook Pixel results in two snippets of data (a cookie containing a Facebook ID within a longer alphanumeric string of characters and a startribune.com video URL) being "simultaneously disclosed" to Facebook; (¶¶25-30); and (2) from these two snippets of data, "the video material accessed by a specific [Facebook user] can be determined." (¶30.)

That's it. Plaintiff doesn't allege that Facebook Pixel **connects** these two data points when sending them to Facebook—much less connects them into a form that would be discernable to an ordinary person. Nor does Plaintiff allege that Facebook connects the data after receiving them from Facebook Pixel. Indeed, Plaintiff doesn't allege anything substantive about the Facebook Pixel disclosures at all—other than dropping into the middle of the Complaint an unexplained, uncited screenshot of his own web browser with settings turned on that show cookies. (¶25.) Plaintiff's theory appears to be that the mere *existence* of the two snippets of data somewhere in a Facebook database is enough to make out a VPPA disclosure violation.

It is not. Unless the "simultaneous disclosure" arrived (or at some point turned into) something tying specific video URLs to specific Facebook users—like the rental-history printout that precipitated the Bork exposé—it is simply not plausible to call it "a disclosure[] of information that would, with little or no extra effort, permit an ordinary recipient to identify a particular person's video-watching habits." *In re Nickelodeon*, 827 F.3d at 284. No ordinary person could receive a list of third-party browser cookies, on the one hand, and a list of startribune.com URLs, on the other, without **any** connective tissue between the two lists, and "identify a particular person's video-watching habits" from it. *Id.*

*Hulu* is instructive on this point. The facts were analogous: Hulu, like the Star Tribune, used Facebook Pixel on its website. This resulted in Hulu sending cookies of Facebook IDs and Hulu video URLs to Facebook when Facebook users watched

Hulu videos, an alleged VPPA violation. *In re Hulu*, 86 F. Supp. 3d at 1092-94. The court closely examined the text and purpose of the VPPA and determined that, for this specific Facebook Pixel disclosure to violate the VPPA, the plaintiff needed to show that Facebook actually "read" the two pieces of information "together," "yielding something akin to the list of Judge Bork's videos." *Id.* at 1097. If the plaintiff couldn't show this, "then there cannot be a VPPA violation." *Id.* For "even if both elements were sent to Facebook, they did not necessarily disclose a user 'as having requested or obtained specific video materials' unless Facebook *combined* the two pieces of information." *Id.* at 1096 (emphasis added). Were the standard otherwise, the court concluded, the proverbial Judge Bork video store clerk could violate the Act simply by giving a third party "a slip of paper showing only someone's name," and then, "weeks later," "a list of video titles," without any "obvious connection between the two." *Id.* But this could not possibly constitute a disclosure of "personally identifiable information," the court reasoned, because the store clerk had not "tied a person to specific videos." *Id.* Applying this standard, the *Hulu* court ruled that because the plaintiff did not point to *any* facts showing "that Facebook combined the" information it received from Hulu into something that would "yield 'personally identifiable information'" under the VPPA, Hulu was entitled to summary judgment. *Id.* at 1097.

This case is even easier than *Hulu*. Whereas in *Hulu* the court was confronted with a difficult question of first impression and did not have a chance to articulate the proper legal standard until summary judgment, here the Court can simply apply the *Hulu* court's standard to Plaintiff's complaint. And under that standard Plaintiff fails to allege ***any*** facts suggesting that either the Star Tribune or Facebook "combined" the relevant Facebook Pixel data points into "something akin to the list of Judge Bork's videos," from which an ordinary person could then tie Plaintiff to the specific startribune.com videos he watched. *Id.* at 1096-97. Consequently, there was no disclosure of "personally identifiable information" under the statute. Dismissal for failure to state a claim must likewise follow.

### B.  Plaintiff Fails To Plausibly Allege That The Star Tribune "Knowingly" Disclosed Personally Identifiable Information Connecting Plaintiff To The Videos He Watched.

The Complaint also fails to plausibly allege that the Star Tribune "knowingly" made any improper disclosures. 18 U.S.C. § 2710(b)(1). Beyond defects in alleging personally identifiable information connected to the videos he watched, the Complaint should be dismissed for this reason too.

To plausibly plead a "knowing" violation, a plaintiff must allege facts showing "that the video-service provider *actually knew* that it was disclosing: (1) a user's identity; (2) the identity of the video material; *and* (3) the *connection* between the two—*i.e.*, that the given user had 'requested or obtained' the given video material." *In re Hulu*, 86 F. Supp. 3d at 1097 (emphasis added).

Plaintiff fails to meet this standard for reasons similar to those discussed in the prior section. The entirety of Plaintiff's "knowledge" allegations are that the Star Tribune "knows" that video URLs and Facebook IDs are "simultaneously disclosed by Facebook Pixel," and that "such data in combination identifies subscribers and the videos they watched." (¶¶31-32.) Plaintiff does not allege, however, that the Star Tribune *knew* that Facebook would *actually connect* the disclosed video URLs and Facebook IDs into something approximating the Judge Bork video list. Mere knowledge that two pieces of data could *hypothetically* be combined to identify subscribers and the videos they watched is not enough to state a VPPA claim. *See In re Hulu*, 86 F. Supp. 3d at 1097 (rejecting this argument and granting summary judgment on the knowledge element). Failure to plead a "knowing" disclosure of "personally identifiable information" is thus another ground for dismissal.

## C.   Plaintiff Consented To The Disclosure Of His Personally Identifiable Information To Third Parties.

Finally, beyond all of the Complaint's defects in its allegations of standing and the merits of a VPPA claim, Plaintiff's claim should be dismissed because he consented to his information being disclosed to third parties via cookies, and so the VPPA's safe harbor bars his claim. *See* 18 U.S.C. § 2710(b)(2)(B).

The VPPA states that a disclosure of "personally identifiable information" does not violate the statute if the consumer gives their "informed, written consent (including through an electronic means using the Internet)" that is in a form distinct

and separate from forms setting forth other financial obligations, and with a "clear and conspicuous" opportunity for the consumer to opt out of the disclosure. *Id.* Although Plaintiff alleges that "he did not consent to the disclosure of his [personal information], in writing or otherwise," and that the Star Tribune "did not attempt to obtain [his] consent in a form separate and distinct from other legal obligations" (¶51), documents incorporated by reference into the Complaint directly refute this allegation. *See Zean*, 858 F.3d at 526-27 (holding that courts may consider "matters incorporated by reference" into a complaint, including contracts showing consent, "without converting the motion into one for summary judgment").

Plaintiff concedes in his Complaint that he is a Star Tribune subscriber. (¶45.) Plaintiff also concedes in his Complaint that, as a Star Tribune subscriber, he is bound by the Star Tribune's Terms of Use. (¶11.) These Terms of Use reference within them a Star Tribune Privacy Policy. (Bernard Decl. Ex. B.) And that Privacy Policy clearly states that visiting startribune.com may result in "third parties . . . deliver[ing] cookies to your computer . . . for the purpose of tracking your online behaviors across nonaffiliated websites," and that, by using startribune.com, subscribers (including Plaintiff) "*consent[]* to the collection, use, *and disclosure* of information, including [their] Personal Information":

**2. THIRD-PARTY COOKIES** | back to top

Other third parties may deliver cookies to your computer or mobile or tablet device for the purpose of tracking your online behaviors across nonaffiliated websites and delivering targeted advertisements either on our Sites or on other websites.

30

**12. YOUR CONSENT** | back to top

By using any Star Tribune–owned website or mobile or tablet application on which this Policy is posted, you are consenting to the collection, use, and disclosure of information, including your Personal Information, as set forth in this Policy. If you do not agree to be bound by this Policy, you may not access or use our Sites.

(Bernard Decl. Ex. A.)

Important here, the Star Tribune Privacy Policy also provides detailed information about third-party cookies and cookies delivered by the Star Tribune through startribune.com, replete with helpful links to *opt-out* of third-party collection and other means for a subscriber to change their privacy preferences. (*See, e.g.*, *id.* § 2.) And although the Privacy Policy is referenced in the Star Tribune's Terms of Use (*id.* § 14), it is nonetheless presented as a *separate*, standalone form on startribune.com. (Bernard Decl. ¶ 9.) The Policy is also limited to obtaining a subscriber's consent to the collection, use, and disclosure of their personal information; it contains no other legal or financial obligations. (*See generally* Bernard Decl. Ex. A.)

Thus, every time Plaintiff watched videos on startribune.com as a Star Tribune subscriber, he consented to Facebook Pixel collecting his information (via third-party cookie) and sending that information to Facebook. And this consent complied with the VPPA safe harbor because it was made via an "electronic" "written" form that was "given at the time the disclosure is sought," in a form "distinct and separate" from "other legal or financial obligations," and with a "clear and conspicuous" opportunity "for the customer to withdraw from ongoing disclosures." 18 U.S.C. § 2710(b)(2)(B).

31

The Eighth Circuit reached a similar conclusion in *Zean*. There, a district court dismissed a TCPA claim because the defendant's business records showed that the plaintiff had given "express consent" to the telephone calls he complained of, and so the TCPA's safe harbor barred his claim. 858 F.3d at 524-25. The Eight Circuit affirmed. The Court reasoned that because the plaintiff "alleged breach of a statutory TCPA duty arising out of a contractual relationship," and because the business records attached to defendant's motion to dismiss "reflect[ed]" the parties "contractual relationship," and "refute[d]" the plaintiff's "conclusory allegation" of non-consent, the safe harbor applied. *Id.* at 527.

Likewise here. Records similar to *Zean*—the Star Tribune's Privacy Policy—directly refute Plaintiff's conclusory allegation that he didn't consent to his personal information being disclosed to third parties via cookie. Thus, even if Plaintiff states a VPPA claim on the merits, the complaint still fails under the VPPA's safe harbor.

## <u>CONCLUSION</u>

For these reasons, the Court should grant the Star Tribune's motion and dismiss the Complaint. Because of the importance of these issues and their likelihood of recurrence, the Star Tribune requests that the Court rule on *both* standing and the merits.

Dated: October 13, 2022.          **FAEGRE DRINKER BIDDLE & REATH LLP**

                                      */s/ Jeffrey P. Justman*

Jeffrey P. Justman (#390413)
Anderson C. Tuggle (#0400277)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
jeff.justman@faegredrinker.com
anderson.tuggle@faegredrinker.com

*Attorneys for Defendant Star Tribune Media Company LLC*