UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                ) COURT FILE
Kyle Feldman, *on behalf of*    ) NO. 22-CV-1731 (ECT/TNL)
*himself and all others*        )
*similarly situated*,           )
                                )
                Plaintiff,      )
                                )
        vs.                     )
                                )
Star Tribune Media Company, LLC,)
                                ) Monday, January 9, 2023
            Defendant.          ) St. Paul, Minnesota
                                ) 9:00 A.M.
------------------------------------------------------------

**HEARING ON**

**<ins>DEFENDANT'S MOTION TO DISMISS</ins>**


**BEFORE THE HONORABLE ERIC C. TOSTRUD**
**UNITED STATES DISTRICT JUDGE**


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

**A P P E A R A N C E S :**


For the Plaintiff:          **LIDDLE SHEETS COULSON, P.C.**
                            By:  NICHOLAS A. COULSON, ESQUIRE
                            975 East Jefferson Avenue
                            Detroit, Michigan  48207



For the Defendant:          **FAEGRE DRINKER BIDDLE & REATH, LLP**
                            By:  JEFFREY P. JUSTMAN, ESQUIRE
                                 ANDERSON TUGGLE, ESQUIRE
                            2200 Wells Fargo Center
                            90 South Seventh Street
                            Minneapolis, Minnesota 55402




                    *     *     *     *

```
 1        (9:00 a.m.)

 2                  P R O C E E D I N G S

 3                    IN OPEN COURT

 4        THE COURT:  Good morning, everyone.  Please be

 5   seated.

 6        This is Kyle Feldman versus Star Tribune, Civil

 7   File Number 22-1731.  Let me invite counsel to note their

 8   appearances, starting with the plaintiff.

 9        MR. COULSON:  Good morning, Your Honor.  Nick

10   Coulson for the plaintiff.

11        THE COURT:  Good morning.

12        And how about for the Star Tribune?

13        MR. JUSTMAN:  Good morning, Your Honor.  Jeff

14   Justman from Faegre Drinker for Star Tribune.  With me is my

15   colleague Anderson Tuggle.  We have Randy Lebedoff, who's

16   the General Counsel at the Star Tribune, and Jim Bernard,

17   who's the Senior Vice President of Digital at the

18   Star Tribune.

19        THE COURT:  Terrific.  Good morning.

20        All right.  Mr. Justman, it's your motion.  Let's

21   hear from you first.  I have questions.  I'll do my best to

22   sort of ask them where they seem to fit into your argument.

23        Well, actually, let me just get right to it here

24   because we don't have a lot of time.  We've got another

25   hearing at 10:00 and then another one at 11:00 after that,
```

1    so we've got sort of a full morning here.

2              How did the common law define a private fact for

3    purposes of the publication of private facts tort?

4              MR. JUSTMAN:  So, yeah.  If we're talking about

5    the publication of private facts tort, you need a

6    publication or publicity.  It needs to be something that

7    is -- I think the phrase in the cases is like -- let me just

8    jump into that.

9              It's not outrageous, but something that's like

10   offensive to more than the average person, and those are the

11   two factors that we focus on in this case that Plaintiff has

12   not alleged and we don't think could be alleged in this

13   case, because he concedes on page 11 of the reply brief --

14   and it's not in the complaint -- that no human ever viewed

15   any information that he alleges was sent to Facebook.  So

16   there's no publication.  There can be no publication of

17   private facts.

18             THE COURT:  How did it define "private" fact,

19   "private"?  What's a private fact?  Like, I went out and

20   bought groceries yesterday.

21             MR. JUSTMAN:  Yeah.  I guess -- I haven't looked

22   at that specific issue and I don't think that's raised by

23   the motion.  In other words, we're not contending that

24   Mr. Feldman made public his viewing history by going to the

25   startribune.com.  What we're saying is, if he's trying to

1    create a historical analogue by citing under **TransUnion** the

2    tort of publication of private facts, he needs to allege

3    publicity, and there is no publicity when literally no human

4    on Earth has seen or read his --

5              THE COURT:  I get that.  So you're accepting, in

6    other words, that the purchaser, I guess I should say, of

7    video watching history is a private fact.

8              MR. JUSTMAN:  Yeah.  We haven't argued here today

9    that the videos he watched on startribune.com are available

10   to the public.  I mean -- let me rephrase it in a slightly

11   better way.

12             The videos he watched, literally, if you are a

13   Star Tribune subscriber, you can go to the Star Tribune

14   website and watch the videos, but we haven't argued here

15   today that Mr. Feldman's having watched some unnamed video

16   is itself something that's public, if that makes any sense.

17             THE COURT:  I think so.

18             MR. JUSTMAN:  What we're saying is -- and this is

19   squarely analogous to the **TransUnion** case at footnote 6 --

20   is that you need publication to be at least similar in

21   degree and kind to the common law analogue, and they're not

22   alleging that.  I don't think my friend will stand up here

23   and say that they're alleging that something was publicized

24   to Facebook, much less the world at large.

25             THE COURT:  So "publication" means shared with

1       another.

2               MR. JUSTMAN:  It's a little bit more nuanced than

3       that, but --

4               THE COURT:  Well, give me the nuance then.

5               MR. JUSTMAN:  So it means shared with either the

6       public at large or a large enough group so as to infer that

7       it will be made public, so that's publicity, to be clear.

8               THE COURT:  Could sharing with one person ever be

9       publication under the common law tort?

10              MR. JUSTMAN:  For purposes of the common law tort

11      of publication of private facts, no.  For purposes of the

12      tort of defamation, which is not being raised here, when you

13      share something with one person that can be publication,

14      technically what we're talking about is publicity, which is

15      different than publication.  But for purposes of today's

16      hearing, all that matters is that the information that

17      Mr. Feldman claims was private was not shared with anyone,

18      one person, five people, a hundred people.

19              THE COURT:  No, I'm going to get to that, but let

20      me -- so where do I go in the law for the source of this

21      rule that publication under the old common law tort means

22      publication to some sufficient critical mass of people?

23              MR. JUSTMAN:  Yeah.  So we cite cases in our

24      motion to dismiss and one I think is called the *Yath* case.

25      And I can pull up the specific citation in our brief, but --

1          THE COURT:  I've got *Hunstein* and *Sputz*.

2          MR. JUSTMAN:  So *Hunstein* talks about -- *Hunstein*

3     gives you the framework and footnote 6 specifically says you

4     need to look at whether something is being read and

5     processed by a human being rather than just merely processed

6     by a database.  That case obviously dealt with defamation,

7     which I don't understand Mr. Feldman to claim is the

8     analogous tort here.  The only analogous tort that they

9     raise in their opposition to the motion to dismiss -- and

10    again, that's not even in the complaint, which we think is a

11    defect on its own, but the opposition to the motion to

12    dismiss raises one and that's disclosure of private facts,

13    but that still needs publicity, which is sharing or

14    dissemination of information with a broad group of people or

15    the public.  And you'd go to I believe it's the *Yath* case,

16    *Yath vs. Fairview Clinics*.  That's 767 N.W.2d 34.  We cite

17    that in our brief.

18          THE COURT:  Okay.  So that seems like kind of --

19    and I had a question about that.  That seems like kind of a

20    detour.  So the Supreme Court says that if I'm going to

21    figure out whether there's Article III injury here, I look

22    to the original common law as it exists I suppose at the

23    time Article III is adopted, right?  That's what I'm trying

24    to do.

25          MR. JUSTMAN:  Yeah.  So I think what *TransUnion*

1    says, you look to historical common law analogues under the

2    English or American tradition.  It doesn't say what time,

3    but, you know, we haven't engaged in a debate amongst the

4    parties here about whether it's okay to look at --

5              THE COURT:  I think implicitly you are, because if

6    you're citing Minnesota law today --

7              MR. JUSTMAN:  Well, that's just one example --

8              THE COURT:  Okay.

9              MR. JUSTMAN:  -- right.  So we've also cited the

10   *Restatement* and I don't understand the parties to be in a

11   disagreement about whether a hundred people versus five

12   people is enough, or about how outrageous or highly

13   offensive to the average person the disclosure needs to be.

14   They're saying we don't need to do that.  We're saying you

15   do.  And our view is if you agree with us that he needs to

16   allege the elements of the historical analogue, the common

17   law tort, they haven't done that.  That's not in the

18   complaint and it's not really even in the opposition papers.

19             THE COURT:  Okay.  So let's get to that other

20   issue, then, which is the issue of whether it needs to be

21   disclosed to a living, breathing person.

22             Facebook's got computers that are doing the stuff

23   that people used to do.  I don't pretend to understand it.

24   That can't be enough.  In other words -- and, look, I don't

25   think any of this is in the complaint and they haven't asked

1    for leave to amend, so we're past that as far as I'm

2    concerned.

3              But it seems to me that if the disclosure takes

4    place to some machine that than does the work that human

5    beings used to do and does something with it in a way that

6    injures a person, hypothetically speaking, that could be

7    enough.  You disagree?

8              MR. JUSTMAN:  I wouldn't disagree with you.  If

9    they had pleaded that, which I agree with Your Honor they

10   haven't, and if they had alleged the connection between

11   sharing of information with Facebook and humans looking at

12   it, which they haven't, and then the next step of humans

13   looking at it with some harm to him, which they haven't, I

14   agree with you that would be enough.

15             THE COURT:  Okay.

16             MR. JUSTMAN:  Footnote 6 in *TransUnion* is in our

17   view squarely controlling and says when it's just a mere

18   processing of data and no human understands it or reads it,

19   that's not enough.

20             THE COURT:  Okay.  All right.  Mr. Justman, why

21   don't you pick up where you were planning to argue here and

22   I'll try to stay quiet for a little while.

23             MR. JUSTMAN:  Yeah.  I was going to jump in

24   straight to the Article III injury, because obviously that

25   goes to the Court's jurisdiction and we think that's the

1    most straightforward basis for dismissing.  I've already

2    talked with Your Honor much about that.  You know, I'll just

3    jump into sort of responding to what I understand the other

4    arguments are on that.

5          One argument is other federal courts have found

6    standing in VPPA cases.  Our view is, number one, those

7    cases predated *TransUnion* and can't be squared with its more

8    specific element-by-element analysis.

9          And number two, *TransUnion*, *Spokeo*, and the Eighth

10   Circuit's cases we cite in our brief say it's case by case

11   and, you know, fact by fact.  So the fact that other cases

12   may have found Article III injury doesn't mean that there's

13   a concrete harm in this case is our view.  So I think, you

14   know, that really addresses the main Article III concrete

15   injury point.

16         I did want to also note there's a separate

17   argument we have under the second prong of standing, which

18   is causation and fairly traceable.  My view is the Eighth

19   Circuit's decision in *St. Louis Heart Center* is as close as

20   you can get.  Basically, that says:  Look, if you're the

21   plaintiff and you can prevent the type of injury, you have

22   the means and you have the opportunity to prevent the injury

23   and you don't do it, that cuts off the chain of causation

24   such that it's not fairly traceable.  That's *St. Louis Heart*

25   *Center* we cite in our --

1          THE COURT:  Right.  So a couple things on this

2     just so we're all on the same page.  I haven't read that

3     case.  I've read everything, but I didn't read that case.  I

4     read some of the cases.

5          I think with respect to causation, I'll

6     incorporate a plan for that if it's necessary in the order

7     addressing everything else that you've raised here today.

8     My inclination is not to have a separate hearing on that,

9     but it is to send you to Magistrate Judge Leung and let you

10    argue about whether discovery ought to be bifurcated and

11    focused on those particular issues.  But even if he says no

12    to that, you still have the capacity to focus on what you

13    need early on and obviously you're not barred from bringing

14    a successive 12(b)(1) motion.

15          MR. JUSTMAN:  Yeah.  Our view is the Court can

16    grant our motion today even if it doesn't address causation

17    or fairly traceable.  And even aside from that, the hearing

18    issue, we just wanted the Court to know that we can try and

19    make complex technical arguments about what Pixel does and

20    what a cookie is, you know, clearer if the Court had wanted

21    to have a hearing.  We've submitted evidence.  We think it's

22    appropriate.  They haven't submitted counter evidence, so

23    our view is the Court can decide how it wants to handle that

24    without needing to refer something to a magistrate judge or

25    to have bifurcated discovery.

1          THE COURT:  No, I appreciated the suggestion and I

2     don't intend to refer the substantive issue to Judge Leung,

3     just --

4          MR. JUSTMAN:  Yeah.  So then our view -- I'll just

5     move to the merits, understanding time is short this

6     morning.

7          Our view on the merits is there isn't in the

8     complaint any allegation sufficiently specific to explain

9     the connection.  It's not about personally identifiable

10    information.  It's about the connection between

11    Mr. Feldman's Facebook ID and the URLs that show the videos

12    he allegedly watched.  The ***Hulu*** case from 2015 in California

13    makes this very clear.  You can't just say the Star Tribune

14    disclosed a Facebook ID.  You can't just say the Star

15    Tribune disclosed video URL information.  You need to allege

16    that they've disclosed them together at the same time in the

17    same way such that a reasonable person would view them just

18    like the Judge Bork video store clerk did.

19         THE COURT:  Ordinary person.  Who's an ordinary

20    person?

21         MR. JUSTMAN:  I think Your Honor is an ordinary

22    person.  I think I'm an ordinary person.

23    (Laughter)

24         THE COURT:  So someone not necessarily learned in

25    the technology.

1          MR. JUSTMAN:  I don't think you need to be learned

2     in the technology.  I think if you are learned in the

3     technology, that would be a factor to consider.  I don't

4     think that matters in this case because they haven't

5     explained how the sort of complex screenshot that shows a

6     whole bunch of cookies and other weird information can be

7     viewed by anyone, whether it's ordinary or extraordinary,

8     whether at Facebook or in the world at large.

9          The other thing I'll just note on this, Your

10    Honor, the statute requires that the plaintiff identify

11    specific video materials.  That's the phrase, specific video

12    materials.  The complaint doesn't include one video that

13    Mr. Feldman says he watched, not the specifics of one video.

14    So in our view that's deficient for reasons similar to our

15    Article III standing argument.

16          But normally the plaintiff says, "Hey, I watched

17    this video."  The only video that's specifically identified

18    in the complaint is a video about NASA, and the allegations

19    are very clearly -- I'm trying to think of the right word.

20    They do not clearly identify Mr. Feldman as having watched

21    that video.  That's a defect that he could theoretically

22    cure, but that's not something that has been specifically

23    alleged in the complaint.  So if you want to know what I'm

24    referring to, Your Honor, it's --

25          THE COURT:  No, I got it, paragraphs 23 to 26.

1          MR. JUSTMAN:  Yeah.  It just says this is what

2     occurs when someone visits a website.

3          THE COURT:  Yeah.  I note that now.  It's in the

4     passive voice throughout.

5          MR. JUSTMAN:  Yeah.  There are allegations that he

6     watched videos, but he needs to specify what videos they are

7     to state a claim under the statute.

8          I'll probably have more thoughts and maybe

9     comments following my colleague's presentation, but with

10    that I'm happy to sit down or answer other questions Your

11    Honor might have.

12         THE COURT:  No, I think that'll do it.  Thank you,

13    Mr. Justman.

14         MR. JUSTMAN:  Thank you.

15         THE COURT:  Mr. Coulson?  You probably gather the

16    first question I'm going to ask you is how is Mr. Feldman

17    injured.

18         MR. COULSON:  So, Your Honor, our position is that

19    the defendant's take on the injury-in-fact argument or

20    analysis --

21         THE COURT:  No.  How is he injured?

22         MR. COULSON:  Certain things are an injury, Your

23    Honor, and this is treated really well in the *Eichenberger*

24    case, but certain things are an injury simply by virtue of

25    an intrusion into one's private space.  This is something we

1   address in terms of the legislative history of the Act that

2   *Eichenberger* touches on, but sometimes things are offensive

3   just because of the intrusion.  And so we can talk about all

4   kinds of potential uses of that information and the ways

5   that Facebook uses it to market back to you or to try to

6   create an image of your interests, your political views,

7   your proclivities, the things that they can sell to you, the

8   things that they can try to market for your attention.

9           But the core injury here and what the court says,

10  the Ninth Circuit says, in *Eichenberger* is that any

11  violation of this statute is a concrete injury because of

12  the invasion into that private space, and the legislative

13  history gives all the reasons why that would be so offensive

14  and why that is private information.

15          THE COURT:  So it's not possible for someone, in

16  your view, to violate the statute and not violate

17  Article III, not run afoul of Article III.  Every violation

18  of the statute is sufficient to show injury under

19  Article III.  If that's your position, then I've got some

20  other questions for you.

21          MR. COULSON:  I'm trying to think of a

22  hypothetical, Your Honor, that would sort of disprove that

23  general rule and I'm not sure that I have one.  I'm not sure

24  that every single violation that's conceivable does, but

25  certainly what the Ninth Circuit says in *Eichenberger* is

1    that if you have intruded into someone's space in this way,

2    then that is a concrete injury *per se*.

3         The distinction between a substantive violation,

4    which is what you have under VPPA, and a procedural

5    violation, a mere procedural violation, which is what you

6    have in these **Mailing Vendor** theory cases under the FDCPA,

7    is a crucial distinction, and it's really well-treated in

8    **Eichenberger**.  You know, it's a big difference -- we have

9    Congress saying -- we have to remember that under both

10   **Spokeo** and **TransUnion**, the Supreme Court has told us that it

11   is both history and the judgment of Congress that are

12   relevant in determining --

13        THE COURT:  Well, but Congress can sort of nudge

14   at the boundaries of Article III, but it can't blow past

15   them.

16        MR. COULSON:  Certainly, Your Honor, and we're in

17   complete agreement there.

18        And so one situation in which Congress could nudge

19   at the boundaries of it is by taking something which would

20   be -- the historical analogue would be, well, it's, you

21   know, disclosure to another person and it's offensive.  And

22   here the defendant has made a lot of hay about the fact that

23   there's no evidence that any human being ever actually saw

24   that.

25        We think it's worse here.  We think it's a lot

1    worse, that it's not, as the Court said necessarily, that

2    computers taking on a job that used to be fulfilled by

3    humans.  This is not similar to Ted in a cubicle somewhere

4    in San Francisco having access to information that happens

5    to be sent over Facebook.  This is information that's being

6    disclosed to hyper-sophisticated artificial intelligence in

7    order to create a portrait of someone and give Facebook

8    information that most people would find to be extremely

9    offensive.

10            I mean, this is -- the information that Facebook

11   has about every single one of us and that they can use your

12   viewing history to see:  Do you look at more articles about

13   Republican or Democratic candidates?  What are your views on

14   controversial social issues?  Any of these other things that

15   could be in the context of a news cite, very telling as to

16   somebody's proclivities, interests, leanings --

17            THE COURT:  All right.  So here's where I'm

18   looking for help.

19            You've described what might be an injury.  Where

20   do I go in the complaint, what paragraphs do I look at, to

21   see where those injuries are actually injuries Mr. Feldman

22   suffered?

23            MR. COULSON:  It's inherent to the Facebook Pixel,

24   Your Honor, and I gather that perhaps this requires the

25   application of some reasonable inference from the complaint.

1              We are not suggesting that any specific use was

2    made of Mr. Feldman's data because we don't have access to

3    that.  That's something we could not possibly know prior to

4    discovery.  But it's our position -- and we think it's a

5    well-supported position -- that the mere intrusion into his

6    private space in the absence of a disclosure that Congress

7    felt necessary to impose on these things and in the absence

8    of anything that would have fairly told him:  Hey, this is

9    what we're going to do with your data, the mere intrusion of

10   that and provision of it to one of the largest corporate

11   entities on the planet that's going to do all sorts of

12   things with it, that alone constitutes an injury, and that's

13   why we believe that these arguments are no longer being

14   raised in these cases as it relates to standing.

15             In fact, I've got two cases where the defendant

16   just invoked federal jurisdiction on these cases.  It's

17   just -- it's not an argument -- after the line of cases that

18   followed *Spokeo*, after the Michigan privacy protection case

19   that did follow *TransUnion*, the intrusion itself is

20   offensive enough to create an injury regardless of what

21   Facebook does with that information and regardless of what

22   the defendant is able to do with that information as it

23   relates to their relationship with Facebook.

24             THE COURT:  So the use of the passive voice with

25   respect to this NASA video was deliberate, and that's not

1    something that you're alleging Mr. Feldman watched

2    necessarily.

3              MR. COULSON:  That was intended to be

4    illustrative, Your Honor, so that is not one of Mr. Feldman

5    specifically.

6              And I would note that the statute does talk about

7    the disclosure of specific video materials, meaning what I

8    believe our burden to allege is that the defendant did

9    disclose which specific video materials the plaintiff

10   viewed.  I don't believe as a threshold matter that we have

11   to go through and list each and every video or even a subset

12   of the videos that Mr. Feldman actually viewed.  If the

13   Court disagrees with that, we would request leave to amend,

14   because I believe that's something that we can allege, but

15   don't believe that that's material as a threshold matter

16   here, because the statute just states we have to allege that

17   the defendant is disclosing.  It's not that the defendant is

18   telling Facebook this person is watching some video on our

19   site.

20             And that also goes, Your Honor, to the defendant's

21   knowledge argument, because the entire purpose of this Meta

22   or Facebook Pixel device is for Facebook to glean the

23   information of which specific material is being accessed by

24   which people.  Meta has no interest in learning this video

25   was viewed by some person at the same time that it learns

1    John Doe viewed some video.  Meta wants to know John Doe

2    video XYZ.  That's the data that's useful to them and that's

3    what their purpose is in monetizing views of the website

4    with this Facebook Pixel.

5            THE COURT:  So this is knowledge on the merits

6    you're talking about now.

7            MR. COULSON:  It is, Your Honor --

8            THE COURT:  Okay.

9            MR. COULSON:  -- but it's just a closely-related

10   concept.

11           THE COURT:  Where do I go in the complaint to find

12   an allegation that suggests that the Star Tribune knew that?

13           MR. COULSON:  Your Honor, I believe that we do

14   state knowingly -- when we talk about the simultaneous and

15   joint disclosure, so at paragraphs 23, 30, 31, 49 -- and I

16   believe there are a number of other places that we state

17   "knowingly," but it's the entire purpose, Your Honor.

18   Again, it's a reasonable inference area perhaps, but it's

19   the entire purpose of a sophisticated web presence

20   incorporating Meta Pixel on its website.

21           So when their web designers create their page,

22   they have to actually implement code that inserts this

23   cookie that opens this door to Facebook for their website

24   viewers.  And so they know what it does because there's a

25   reason that they're putting it in the website.  It's sort of

1    like having a lock on the door of your house.  You have a

2    lock on the door of your house because you know it looks the

3    door.  You put Meta Pixel in your website because you know

4    it simultaneously discloses these pieces of information to

5    Facebook, who they then can provide you with access to some

6    of that data in a way that you can monetize either through

7    remarketing to people or targeting them on your own site

8    with specific things.

9              So those are the reasons that it's simply not a

10   credible argument that the defendant wouldn't have known.

11             THE COURT:  All right.

12             MR. COULSON:  Your Honor, I would probably just

13   move to the substantive portion, the merits portion of the

14   argument, because we really do believe that the standing

15   issue is closed on VPPA cases.  That ship has sailed.

16             And I guess just to close the loop on the standing

17   point, the statute that's at issue matters, the harm

18   involved matters, and the type of information that is

19   disclosed matters.  And that's why in our brief we cite the

20   *In re Mailing Vendor* theory cases that basically says:  Come

21   on.  We have a hard time with the idea that there's a

22   historical analogue for the disclosure of your failure to

23   meet a modest obligation.  This is not that.  This is

24   something where Congress can provide that nudge, where

25   Congress can say, look, we do live in a different society

1     than we lived during the adoption of Article III in the

2     Constitution and that technology provides opportunity for

3     intrusions that are analogous, but not exactly the same at

4     the time, and here's why we think this is offensive:  It

5     inhibits thought.  It inhibits, you know, the development of

6     thought.  It inhibits all these things and people in general

7     would find it to be offensive that these are things that are

8     being functionally sold from one entity to another as it

9     relates to them specifically and that's reflected in the

10    judgment of Congress.

11            As it relates to the substantive elements of the

12    VPPA, Your Honor, rarely if ever is there a situation in

13    which such -- frankly, almost identical fact patterns have

14    been scrutinized under the same legal theory so many times,

15    so recently, and they've all come out the same way.

16            And I think the one most glaring thing that I want

17    to address is the comparison to the *In re Hulu* case, because

18    *Hulu* is different.  *Hulu Privacy* relates to -- first of all,

19    there are a number of things in that case that cut out our

20    way, frankly, but *Hulu* was under a different set of factual

21    circumstances where there were two separate data points

22    being disclosed and there was no evidence that they were

23    being disclosed together, simultaneously, to Facebook in a

24    way that would allow it to make use of that information as

25    the person viewed this video.

1          And that's why the *Epoch Times* case that we cited

2     in our notice of supplemental authority, but also the

3     *Lebakken* case and the *Louth* case, which was the NFL case,

4     they cite *Hulu* and they still, just like every single other

5     case on this issue to come out recently under the current

6     configuration of the Meta Pixel, have found that no, this

7     constitutes PII.  When you disclose these things together,

8     which is not a coincidence, it's done so that it's a single

9     sort of data point that Meta can use, that constitutes PII.

10          So that's the key distinction with *Hulu*.  *Hulu* is

11     an outdated case based on -- at least as it relates to the

12     real world factual scenario, because that's not the way that

13     it works anymore.  That's not what this case and this recent

14     line of cases alleged.  And so it's the entire point of the

15     current configuration of Pixel for them to be able to make

16     specific determinations about who viewed what.  And in our

17     view, although obviously computers were not around at the

18     adoption of Article III, it's much more offensive to have

19     this sophisticated picture created of one's viewing habits

20     and interests by artificial intelligence than it would be if

21     one or three or five people in a back office somewhere had

22     access to this information.  And frankly, we're not alleging

23     that, but that may well be the case.  It's just -- it's not

24     material to our position.

25          THE COURT:  I do think it's sort of -- I don't

1    think -- as I sit here, I don't think it's either here or

2    there, but you're spending a lot of time talking about

3    modern technology and we're talking about a statute here

4    that's directed to videotapes.  Anyway.

5           MR. COULSON:  The modern technology, Your Honor,

6    obviously relates more to the historical analogue component

7    of the injury-in-fact analysis, but it's that modern

8    technology and the application of it and the way that this

9    operates that makes this so offensive, and it underscores

10   why this is PII, why this is something that's worth

11   protecting and why it does not matter that no human being is

12   necessarily viewing this information, because it's being

13   used for, frankly, much more -- I won't say sinister, but a

14   much more offensive purpose in our view.

15          THE COURT:  All right.  Thank you, Mr. Coulson.

16          MR. COULSON:  Thank you, Your Honor.

17          THE COURT:  Mr. Justman?

18          MR. JUSTMAN:  Thanks, Your Honor.  I have a few

19   points I'd like to address and I'll take them in sort of a

20   two-part approach, first addressing the Article III injury.

21          The Court asked about, you know, what are

22   authorities that talk about publication of private facts.

23   We've cited these in our briefs and in the supplemental

24   authorities.

25          But just to redirect Your Honor's attention,

1      *Hunstein* from the Eleventh Circuit, that's the *en banc*

2      decision, and *Shields* from the Tenth Circuit, we cited that

3      recently in our supplemental authority letter.  Those both

4      go through the exact same analysis that we think Your Honor

5      would apply here to dismiss for lack of a concrete injury,

6      because there's no publicity under the historical common law

7      analogue.

8              A lot of what I heard my colleague just say is

9      interesting and hypothetical, but it's not alleged in the

10     complaint, so discussions about hyper-specific artificial

11     intelligence, you know, use of information to glean what

12     political candidate someone supported, that's not close to

13     being alleged in the complaint.  You can't infer that.  He

14     didn't cite any paragraphs from which you could reasonably

15     infer that those are harms that you can glean from the

16     complaint.

17             The argument as I understand it is essentially

18     that because recent decisions haven't addressed Article III,

19     that's for all times decided, the ship has sailed I think is

20     what was said, that's not what *TransUnion* says.  *TransUnion*

21     says you look at it case by case.  We cite other decisions

22     that look at it on a case-by-case analysis.

23             And as Your Honor knows, it's not just a unique

24     FDCPA-type theory, right?  *Spokeo* and *TransUnion* were Fair

25     Credit Reporting Act cases.  *Hunstein* was a Fair Debt

1    Collection Practices Act case.  We've cited cases from the

2    Cable Act, from the TCPA, and other federal statutes, so

3    obviously Article III applies equally across all of those.

4              There was a discussion about whether it's

5    necessary to allege what specific videos were alleged, and

6    our view is that is necessary both to state a claim under

7    the statute, but also to inform the Court of whether

8    disclosure of that would be highly offensive under the

9    historical common law analysis, right?  If you go to the

10   Star Tribune's website and read an article about a matter of

11   current events, that's not necessarily going to be highly

12   offensive to the average or ordinary person, so that's why

13   in our view an allegation of the specific video is necessary

14   both for the merits, but also for Article III purposes.

15             Your Honor's brow is furrowed.

16             THE COURT:  Oh, I'm going back to the private fact

17   question that I asked earlier.

18             MR. JUSTMAN:  Okay.

19             THE COURT:  And the reason I asked that

20   question -- and I probably didn't make it very clear -- is

21   just that, which is your position is that whether a

22   plaintiff in a case like this has plausibly alleged

23   Article III injury depends in part on the content.

24             MR. JUSTMAN:  Yes.  Because under the historical

25   analogues that he says in the motion to dismiss papers --

1    now, again, those aren't in the complaint -- one of the

2    elements is that it's highly offensive to an ordinary person

3    to have that information publicized, and we can't know if it

4    would be highly offensive to the ordinary person that

5    Mr. Feldman's video viewing history would be highly

6    offensive if it were publicized because we don't know what

7    those videos are.  Going to a mainstream news outlet's

8    website isn't in itself highly offensive to the ordinary

9    person in our view.

10           And just to conclude, you know, we don't think

11   that any of the distinctions that our colleague drew about

12   *Hulu* are material.  That case also involved the same type of

13   cookie, what's called the c_user cookie, you know, a digital

14   piece of data, and the court in California said you need to

15   know what the piece of data is, you need to know what the

16   videos are, and it needs to connect them together.  And for

17   the knowledge element of the statute, the defendant needs to

18   know that they were connected and you need to have plausible

19   allegations showing knowledge of the connection, and that's

20   not alleged here.  And in our view that's why some of the

21   cases that have been cited recently, they don't really

22   address that specifically.  Most of those cases talk about

23   whether a defendant is a videotape service provider, or

24   whether the plaintiff is a consumer, or whether a Facebook

25   ID is personally identifiable information.  We're not

1    arguing any of those three things here.  We're talking about

2    the connection piece of it.

3           So if Your Honor doesn't have any further

4    questions, I'll --

5           THE COURT:  I have one question, but it's just out

6    of curiosity.  I really don't think it affects the -- it

7    doesn't affect the decision here in any way, but we've got

8    this statute out here on videotapes which I spent a fair

9    amount of time with over the weekend.  We don't have a

10   similar statute out there on books, I assume --

11          MR. JUSTMAN:  Correct.

12          THE COURT:  -- or newspapers.

13          MR. JUSTMAN:  Correct.

14          THE COURT:  Or political tracts.

15          MR. JUSTMAN:  I think that's right.  So what's

16   interesting, I think --

17          THE COURT:  It's weird.

18          MR. JUSTMAN:  Well, it is weird and you'd --

19          THE COURT:  Odd.

20          MR. JUSTMAN:  -- have to dig deeper into the

21   legislative history to understand why Congress -- and some

22   of the legislative history materials that are cited in the

23   motion to dismiss opposition.  They reference books and

24   things, and then obviously books are not in the final

25   statute, so something changed.

1    I will point out I think there are some state

2    statutes that go different in scope, so I think the Michigan

3    statute might relate to books, for example.  That's just as

4    a matter of historical curiosity.  I don't know why that is.

5    But the point there, I think, just to bring it

6    home here, is you need to look at things in context and what

7    Congress was trying to prevent, and they're trying to

8    prevent someone from publicly disclosing your video viewing

9    history just like Judge Bork was and sending a cookie from a

10   website to Facebook where Facebook is not looking at it, no

11   human is ever seeing it --

12   THE COURT:  Without any allegation, right?

13   MR. JUSTMAN:  Right.  There's no allegation.  And

14   frankly, I don't think there's any allegation in any of the

15   other cases either, right?  This isn't something that's sort

16   of unique to how the complaint here was pleaded.  I don't

17   think this is something that's alleged in any of these

18   Facebook Pixel cases.  As far as I can tell, the plaintiffs

19   in all of these cases are saying just the mere disclosure --

20   and then they're citing some of the pre-*TransUnion* cases

21   that are cited today -- automatically creates an injury in

22   every case, and our view is that can't be right.

23   THE COURT:  All right.  Thank you, Mr. Justman.

24   MR. JUSTMAN:  Okay.  Thank you.

25   THE COURT:  Mr. Coulson, I'll give you the last

1    word.

2           MR. COULSON:  Thank you, Your Honor.

3           I most importantly just wanted to note -- because

4    I think Counsel mistakenly represented our position -- which

5    is not just that because many of these recent cases have not

6    dealt with standing, that that's why the ship has sailed.

7    The ship has sailed because following *Spokeo*, several

8    courts, including courts of appeal, addressed the standing

9    issue in a way that accounts for every salient concern

10   raised in *TransUnion*.  The defendant can point to no

11   language in *TransUnion* that would materially change that

12   analysis, that would undermine any of those opinions.

13          And then, of course, we do have the case dealing

14   with the Michigan statute that is following *TransUnion*, and

15   it's the same analysis, Your Honor.  There is nothing that's

16   materially different that changed that analysis that would

17   render those cases any less instructive.  You know, provided

18   they're not from the Eighth Circuit, but they're certainly

19   persuasive and instructive on this issue and there is no

20   divergence of authority.  It's unanimous.

21          I also wanted to note that the defendant's

22   position about the specific video being disclosed and

23   whether or not that's offensive, that would place Article

24   III courts in a position of deciding as a threshold matter

25   of standing whether or not particular pieces of information

1    either standing alone or in combination were offensive, just

2    a matter of getting through the courthouse door.  That can't

3    possibly be what the analysis is here as it relates to a

4    statute that has decided this type of information is

5    inherently private such that any intrusion into that area is

6    offensive.

7            THE COURT:  I don't think -- that doesn't bother

8    me so much.  I don't think I need to decide it here, but it

9    doesn't bother me, for example, to decide -- to think that I

10   have to look to determine whether I've got a case or

11   controversy, whether the disclosure was about a book or a

12   video, something that sort of gets at First Amendment -- the

13   exercise of constitutional rights versus disclosure of -- I

14   don't know, what running shoes, what brand of running shoes

15   you purchased.

16           MR. COULSON:  Your Honor, it's --

17           THE COURT:  I mean, there are some easy ones there

18   and I'm not bothered by that.  I concede they're being close

19   cases, but this isn't -- I don't know that we're talking

20   about a close case in the abstract.  I think we're talking

21   about a closer case as pleaded.

22           MR. COULSON:  Your Honor, just accepting that that

23   is the test would create not just close cases, but a muddled

24   and inconsistent line of who has access to federal courts

25   and who does not.  Would it be offensive if someone had a

1  non-mainstream political view versus a mainstream political

2  view?  Would it be offensive if someone was interested in

3  products that might reveal something about themselves?  I

4  mean, the number of permutations of what may or may not be

5  offensive there I think is an analysis that the courts are

6  not required to conduct given that Congress has sort of

7  codified and recognized the societal concern that this is

8  inherently private information.

9          THE COURT:  Well, I'll grant you that here.  I was

10  going to take you up on your offer and ask you to define

11  private then.

12          MR. COULSON:  Your Honor, I think privacy relates

13  to a person's expectation -- the reasonable expectation of

14  privacy just like in all the constitutional cases that arise

15  in the criminal context.  And Congress's judgment to codify

16  the expectation of privacy in the VPPA is a reflection of,

17  as is stated in the legislative history, that people expect

18  their private viewing histories to be and to remain private.

19  It's no one's business what's -- sitting in one's own home

20  or one's own office -- what video content one consumes.

21  Certainly I think there are good policy arguments for

22  extending it, but those are policy arguments for Congress to

23  other mediums.

24          And indeed in Michigan, for example, what

25  publications one subscribes to is a matter that's protected

1    by statute, the same as the **Sterk** case that occurred in

2    Michigan under Michigan's version of this Act following

3    **TransUnion**, but here we're dealing with just this viewing

4    history.  It may well be that there are injuries to privacy

5    as it relates to the consumption of materials and

6    information that would give rise to Article III standing,

7    but just simply don't because Congress for whatever reasons

8    in its judgment decided not to enact a statute that covers

9    those things.

10             So I have nothing further unless the Court has

11   additional questions.

12             THE COURT:  I don't think so, Mr. Coulson.  Thank

13   you.

14             MR. COULSON:  Thank you, Your Honor.

15             THE COURT:  All right.  Well, I appreciate the

16   briefing and the argument here today.  It's an interesting

17   question.

18             I wish -- just as an aside that's neither here nor

19   there, but I wish when I was teaching federal jurisdiction

20   at the University of Minnesota I knew about this statute,

21   because I think one could probably draft an interesting test

22   question from it.  Anyway.

23             But as I say, I appreciate the briefing and the

24   argument today.  It's been very helpful in understanding the

25   issue.  The matter is under advisement.  We'll get a

1    decision out as quickly as we can.  And as I say, if

2    circumstances warrant, we'll also in that order address how

3    the causation issue should be handled going forward.

4             Thank you, everyone.  We're adjourned.

5             (Proceedings concluded at 9:46 a.m.)

6                     *     *     *     *

7

8                C E R T I F I C A T E

9

10

11       I, **TIMOTHY J. WILLETTE,** Official Court Reporter

12       for the United States District Court, do hereby

13       certify that the foregoing pages are a true and

14       accurate transcription of my shorthand notes,

15       taken in the aforementioned matter, to the best

16       of my skill and ability.

17

18

19             */s/ Timothy J. Willette*

20

21          **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
            Official Court Reporter - U.S. District Court
22       Warren E. Burger Federal Building & U.S. Courthouse
            316 North Robert Street - Suite 146
23              St. Paul, Minnesota  55101
                    651.848.1224

24

25